## STATE v. STEPHEN LAWRENCE KING.

208 N. W. 2d 287.

June 8, 1973—No. 43210.

*C. Paul Jones,* State Public Defender, and *Jerome D. Truhn,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, *Theodore R. Rix, Michael McGlennen, Vernon E. Bergstrom,* and *Henry W. McCarr, Jr.,* Assistant County Attorneys, for respondent.

Heard before Knutson, C. J., and Rogosheske, Peterson, and MacLaughlin, JJ.

PETERSON, JUSTICE.

Defendant, Stephen L. King, convicted of first-degree murder of Donald Lewis Ehrlichmann and aggravated robbery of dece-

dent, contends on this appeal from the judgment of conviction that (1) there was insufficient evidence to support the jury's verdicts of guilt, (2) the trial judge erred in admitting crucial identification testimony, and (3) the trial judge erred in denying defendant permission to inspect certain police reports, one of which defendant asserts contained material information favorable to his defense.

1. The criminal event, related in the testimony of Michael Ehrlichmann, decedent's 22-year-old son, occurred in the late evening of August 30, 1970. The Ehrlichmanns were driving east on Olson Highway toward downtown Minneapolis at about 10:30 p. m. on that date. They stopped at the intersection of Olson Highway and James Avenue North to pick up three hitchhikers. Once in the car, one of the trio, identified as defendant, produced a .22-caliber revolver and ordered Ehrlichmann to turn north onto Emerson Avenue and stop, which Ehrlichmann did. Another of the hitchhikers then ordered the Ehrlichmanns to hand over their wallets, which they did. One of the trio then told defendant to "shoot him now," but defendant said, "No, we'll wait." Complaining that the wallets contained little money, the men ordered decedent to resume driving, which he did. After tapping his son on the knee in silent warning, the elder Ehrlichmann drove the car into a tree, jumped out the left front door, and started running. Two of the hitchhikers emerged from the left rear door of the automobile; defendant jumped from the right rear door and fired three shots at the running Ehrlichmann, killing him almost instantly. The three hitchhikers fled the scene on foot and, after pausing only to ascertain the condition of his father, Michael Ehrlichmann summoned the police.

The convictive evidence, consisting primarily of the positive eyewitness identification by Michael Ehrlichmann, was sufficient to support the jury's finding that defendant was guilty of both murder and aggravated robbery. Michael identified defendant in a police lineup 10 days after the event and, again, at trial. He testified at trial, consistent with the description he had given

to the investigating police, that defendant, wearing a khaki-colored, army-type coat which came past his knees, was the tallest of three young black males standing at the James-Olson Highway intersection and that he was the man who first approached the automobile, asking for the hitch ride. The sole element of misdescription, hereafter considered, was the height of the tall defendant. This tallest of the trio, Michael Ehrlichmann testified, took the seat directly behind him in the automobile, and he heard him, as the man seated behind him, give orders to his father. And he saw him jump from the right rear door and fire the shots which killed his father. Evincing care in his identification of defendant, Michael Ehrlichmann had, at the police lineup, identified only two of the suspect trio.

Secondary identification, placing defendant in the vicinity of the crime and tending to corroborate the identification testimony of Michael Ehrlichmann, was supplied by Mrs. Donna R. Inkala. She testified that she was a passenger in the automobile of her husband, Carl Inkala, when they stopped for a semaphore signal at the corner of Olson Highway and Morgan Avenue North at about 9:45 p. m.—a time 45 minutes earlier than when the Ehrlichmanns picked up the three hitchhikers at an intersection three blocks closer to downtown. She then saw, standing at the corner in front of the automobile's headlights, three young black males, one of whom was wearing a long army-type overcoat coming below his knees. Like Michael Ehrlichmann, she misjudged the height of defendant. Although her husband did not do so, Donna Inkala positively identified defendant, both in the police lineup and at trial, as the man she saw at that time and place.

The identification testimony was clearly sufficient to connect defendant to the robbery and murder. State v. Senske, 291 Minn. 228, 190 N. W. 2d 658 (1971); State v. Stark, 288 Minn. 286, 179 N. W. 2d 597 (1970); State v. Burch, 284 Minn. 300, 170 N. W. 2d 543 (1969). Defendant's separate claim that the robbery was not proved for lack of sufficient evidence of a taking, is utterly

without merit. Contrary to defendant's assertion, there was evidence that the money was taken from the wallets and, in any event, the wallets had value in themselves. The mere fact that the wallets were found in the automobile after the hitchhikers fled does not make the initial taking less a criminal taking. See, State v. Maddaus, 137 Minn. 249, 163 N. W. 507 (1917). The contention, moreover, is completely at odds with the admissions of defendant's appointed counsel in final argument to the jury.

2. Ten days after the crime occurred, Michael Ehrlichmann and Mrs. Inkala identified defendant at a police lineup, the composition of which defendant contends was impermissibly suggestive and, therefore, violative of his right to due process. The sole basis of this contention is the fact that, although all persons in the lineup were of the same race and generally of similar age and physique, defendant, who stood 6 feet 5 inches tall, was conspicuously taller than any of the 7 other persons in the lineup— approximately 5 inches taller than the next tallest man who stood immediately to his left. Although the notable difference in height among the persons in the lineup appears from a photograph of the lineup, there is no basis for concluding that it was a deliberate or even negligent mismatch. Persons of unusual height are not easily obtainable at a given time, and the trial court in pretrial proceedings found that the police officers had made a genuine effort to obtain persons of physical comparability.

A lineup, as the United States Supreme Court declared in Stovall v. Denno, 388 U. S. 293, 302, 87 S. Ct. 1967, 1972, 18 L. ed. 2d 1199, 1206 (1967), must not be "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny due process, but whether it is so must be judged by the totality of the circumstances. All the circumstances tend to negate such inference in this case. Ehrlichmann had described the tallest, armed member of the hitchhiking trio as being about 5 feet 10 inches to 6 feet tall, and Mrs. Inkala had described the tallest of the trio as even shorter, 5 feet 7 inches. It seems clear that if the distinctions in height had been alone the critical ele-

ment of identification, an impermissible suggestiveness would more likely have induced Ehrlichmann to pick the 6-foot tall man next to defendant or Mrs. Inkala to pick even a shorter man in the lineup rather than the unusually tall defendant.

The challenged identification procedure is patently distinguishable from that held impermissibly suggestive in Foster v. California, 394 U. S. 440, 89 S. Ct. 1127, 22 L. ed. 2d 402 (1969). There, in an initial lineup, in which defendant was placed with considerably shorter men, the victim could not make a positive identification. At a one-man showup, which followed, the victim only tentatively identified the defendant. Influenced by the suggestibility of that intervening confrontation, however, the victim made an asserted positive identification of defendant in a second multi-person lineup. Our own decision in Broberg v. State, 287 Minn. 66, 176 N. W. 2d 904, certiorari denied, 400 U. S. 843, 91 S. Ct. 87, 27 L. ed. 2d 79 (1970), affords more persuasive authority because of greater factual similarity. In the lineup in which the defendant there was identified, he was the only person dressed in a workhouse uniform, and only one other of the participants was of defendant's approximate height. Although noting that the lineup may have fallen short of an ideal lineup, we held it was not so suggestive as to deny defendant his right to due process.

The duration and character of Michael Ehrlichmann's on-the-scene exposure to the slayer of his father, moreover, militates against any residual concern that an imperfect police lineup contributed to an in-court misidentification of defendant as the slayer. Neil v. Biggers, 409 U. S. 188, 93 S. Ct. 375, 34 L. ed. 2d 401 (1972), although different in detail, made the same point in connection with a challenged station house identification of an accused rapist by the rape victim. The victim, who observed her assailant during a period of up to one-half hour, first in a kitchen illumined only by a light from the bedroom and thereafter in a wooded area illumed only by a full moon, described her assailant to the police as dark brown in complexion, as between

16 to 18 years old and having a youthful voice, as between 5 feet 10 inches and 6 feet tall, and as weighing between 180 and 200 pounds. An identification confrontation with the accused was arranged 7 months later. The police, after checking the city jail and the city juvenile home, were unable to construct a suitable lineup fitting what the court termed the accused's "unusual physical description" and, therefore, instead conducted a one-man showup. The victim testified that she had no doubt about her identification when she first saw the accused at the station, recognizing him at once because of his unforgettable face. Acknowledging that a long delay before confrontation would be "a seriously negative factor in most cases," 409 U. S. 201, 93 S. Ct. 383, 34 L. ed. 2d 412, but considering that she was "no casual observer," 409 U. S. 200, 93 S. Ct. 382, 34 L. ed. 2d 412, and weighing this opportunity to see and identify with the general accuracy of her pre-identification description and the fact that she had made no prior identification from photographic showing, individual showups, or lineups, the court affirmed the conviction, concluding that there was "no substantial likelihood of misidentification." 409 U. S. 201, 93 S. Ct. 383, 34 L. ed. 2d 412. Our own decision in State v. Parker, 282 Minn. 343, 164 N. W. 2d 633 (1969), is of similar tenor.

3. Defendant contends that he was denied due process by the trial court's refusal to grant him permission to inspect certain police reports, particularly an investigative report of Police Detective Richard O'Brien dated September 1, 1970, disclosing a discarded police lead and the fact that Michael Ehrlichmann and Mrs. Donna Inkala had inaccurately described the height of the tallest of the hitchhiking trio (defendant).[1] Defendant,

---

[1] These are pertinent excerpts from Detective O'Brien's September report: "Det. Anderson contacted a CARL & DONNA INKALLA, 3530 Sheridan Ave. No., 522-2762. These people state that shortly after 10 p. m. on night of occurrence they were driving west on Olson Highway and stopped for the semaphore at Morgan. They say there were three negro males on the north side of the street there. A car stopped ahead of them contained a lone white female and one of the negroes went over to the

in advance of a pretrial hearing, had moved the court to order production of "[a]ll information or materials, of whatever kind, that are favorable to the defendants in terms of guilt or innocence or that go to mitigation of punishment." We hold, for sev-

---

car and said something to her through the window. She then drove on. Inkallas describe parties as *# 1, NM, about 15 yrs. 5' 7, slim with short Afro haircut and wearing what looked like an Army overcoat that was long and hung below his knees*. This party was fine featured and slender. # 2, NM, 16-20 years, wearing metal rimmed glasses, thought he was wearing some kind of striped jacket. # 3, NM, dressed in dark clothing, no further description. Both think they can ID the negro wearing the Army coat and will cooperate in any way possible." (Italics supplied.)

"Deceased's son, MICHAEL JOHN EHR[L]ICHMANN, gave statement to me on 8/31/70, giving details of this offense and he also at that time gave a more detailed description of the suspects as follows:

"# 1. *NM, 16-20 yrs., 5' 10-6',* med. chocolate, 160 lbs., slender build, Negro features but not coarse, black hair in Afro haircut, about an inch and a half long, clean shaven, neat looking. Voice had no accent but seemed rather high and juvenile. This party laughed and giggled a lot while the robbery was occurring. *He was wearing a khaki colored coat w/large wide collar that came past his knees* and looked like it was made of a wool-like material, *something like an Army coat*. This party was the tallest of the three men.

"# 2. NM, 16-20 years old, 5'7 to 5'9, 140-150 lbs., Afro-haircut, about 2 inches long, clean shaven, a little darker than # 1, broad shoulders and the rest of his build was slender. He was wearing rimless glasses with metal frames (those recovered). Voice had no accent but was rather high. He also was giggling and laughing. Seemed to be the oldest of the trio and more or less in command. Wearing a maroon v-neck long sleeve sweater of a wool-like material. Talked in Negro jive.

"# 3. NM, 16-20 yrs., medium chocolate, shortest of the three men and appeared to be the youngest, was quiet and did not say much and victim can give no further description.

*"Victim believes he can identify # 1 & 2 but is unsure about # 3."* (Italics supplied.)

"Received information that a cab driver for Yellow Cab Co. had driven by James and Olson about 15 minutes prior to victim having picked up suspects there. This party is ANDREW GARY FINKS, Cab 76, 3332 Sumter Ave. St. Paul. On talking to him, he said he had picked up

eral reasons, that the denial of this motion did not deny defendant a fair trial.

The motion, as a general matter, was in effect a demand for unlimited pretrial discovery, which, as we held in State v. Mastrian, 285 Minn. 51, 63, 171 N. W. 2d 695, 703 (1969), certiorari denied, 397 U. S. 1049, 90 S. Ct. 1381, 25 L. ed. 2d 662 (1970), is neither authorized nor required. It is no less an impermissible "dragnet" demand simply because it asked only for information "favorable" to the defendant. State v. Martin, 293 Minn. 116, 197 N. W. 2d 219 (1972).

Defendant is entitled, under our rules stated in State v. Thompson, 273 Minn. 1, 139 N. W. 2d 490 (1963), certiorari denied, 385 U. S. 817, 87 S. Ct. 39, 17 L. ed. 2d 56 (1966), and State v. Grunau, 273 Minn. 315, 141 N. W. 2d 815 (1966), to the production, at trial, of a pretrial written statement of a witness for purposes of possible impeachment. Here, however, the pretrial request, was not made in that limited context, and it was not renewed, in any context, at trial. The administration of this rule, like the comparable Federal rule,[2] is entrusted to the "good sense and experience of the [trial] judge * * * subject to the appropriately limited review of appellate courts." Palermo v. United States, 360 U. S. 343, 353, 79 S. Ct. 1217, 1225, 3 L. ed. 2d 1287, 1296 (1959); United States v. Augenblick, 393 U. S.

a negro female at 925 Newton North about 10:30 p.m. and had driven down to James & Olson and had seen three negro males and a negro female on the corner there. One of the males was wearing a pair of 'granny type' glasses. The three ranged in height from 5'8 to 5'10 and were in their teens or early twenties, short Afro haircuts. *He could give no further description on them or clothing and he cannot identify.* We are attempting to locate and interview woman passenger who also saw these parties." (Italics supplied.)

[2] Our rule is an adaptation of the statutory "Jencks rule" applicable to Federal criminal trials. See, 18 USCA, § 3500; Jencks v. United States, 353 U. S. 657, 77 S. Ct. 1007, 1 L. ed. 2d 1103 (1957). The Jencks rule was "not cast in constitutional terms" and accordingly is not mandated for state criminal trials. United States v. Augenblick, 393 U. S. 348, 356, 89 S. Ct. 528, 533, 21 L. ed. 2d 537, 545 (1969).

348, 355; 89 S. Ct. 528, 533, 21 L. ed. 2d 537, 544 (1969). It should be noted that the report did not tend to impeach the trial testimony of Detective O'Brien himself, and since the reported descriptions by Michael Ehrlichmann and Donna Inkala did not purport to be their verbatim statements nor to have been approved by them, the report was not available for use to impeach either of them under the Thompson-Grunau rule.

Defendant on more direct constitutional grounds asserts that nonproduction of the O'Brien investigative report constituted suppression of information vital to the finding of guilt or innocence, a denial of due process within the meaning of Brady v. Maryland, 373 U. S. 83, 83 S. Ct. 1194, 10 L. ed. 2d 215 (1963). We hold, however, on the authority of Moore v. Illinois, 408 U. S. 786, 92 S. Ct. 2562, 33 L. ed. 2d 706 (1972), that under all the circumstances the nonproduction of the O'Brien report did not constitute prejudicial error.

Defendant claims prejudice as the result of the nondisclosure of the information given by Andrew Gary Finks, (see, footnote 1, *supra,*) which, defendant contends, deprived him of an evidentiary "lead." On its face, the information evinces no substantial likelihood of developing significant exculpatory evidence. Moreover, as the United States Supreme Court said in Moore (408 U. S. 795, 92 S. Ct. 2568, 33 L. ed. 2d 713), "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." Relevant to the general claim of unfairness, it should be noted that the prosecution did furnish defendant with considerable pretrial information, including a list of names and addresses of potential state witnesses; the autopsy report; photographs of the decedent and of weapons and cartridges, including ballistic photographic blow-ups; and all physical evidence seized by the state or known by the state and under its control.

The issue as to the nondisclosure of the Inkala-Ehrlichmann information is not so much whether the information should have been disclosed as whether defendant was prejudiced by the non-

disclosure. We have no hesitation in concluding that there was no prejudice. The defense clearly was not ignorant of the discrepancy in the height descriptions as reported to the police by Michael Ehrlichmann and Donna Inkala, for their complete, signed statements, which contained the identical descriptions given by them to the police, were delivered to the defendant at both the pretrial and trial stages. Counsel for defendant cross-examined Michael Ehrlichmann on that discrepancy and argued it vigorously in his summation to the jury. In the words of Moore v. Illinois, 408 U. S. 786, 92 S. Ct. 2562, 2564, 33 L. ed. 2d 706, 709, we conclude that under all the circumstances the nondisclosure of the O'Brien report was "not material under the standard of Brady v. Maryland, [*supra*]."

Affirmed.