**Adrian D. WILLIAMS, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. A07–2148.**

Supreme Court of Minnesota.

April 16, 2009.

Adrian D. Williams, Rush City, pro se appellant.

Lori Swanson, Attorney General, St. Paul; and Michael O. Freeman, Hennepin County Attorney, Michael K. Walz and Lee W. Barry, III, Assistant County Attorneys, Minneapolis, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant Adrian D. Williams is currently serving a life sentence for first-degree murder. On direct appeal, we affirmed his conviction. *State v. Williams,* 586 N.W.2d 123 (Minn.1998). Subsequently, Williams filed a petition for postconviction relief that was denied by the postconviction court without an evidentiary hearing. We affirm.

Williams was charged by indictment for the shooting death of Artis T. Brown, Jr., and the case proceeded to a jury trial. Two days before voir dire began, the State disclosed several new police reports, one of which included a conversation between Officer Otto Wagenpfeil and Brown's girlfriend, Tashawn Griffin. To remedy any prejudice from the late disclosure, the district court offered defense counsel a two-day continuance. Defense counsel instead requested four days, and when the request was denied, declined the two-day offer. This conversation was not on the record and Williams alleges that it was discovered in 2003 by volunteers from the Innocence Project.

On the first day of trial, a juror reported being disturbed that the previous day Juror C.C. had described himself as a white supremacist and had pulled out a pocketknife. The informing juror also stated that Juror Three had been conversing with Juror C.C. during the incident. Williams waived his right to be present when the jurors were individually questioned, but a voice recording of the proceeding was made. Juror C.C. admitted saying that he was a white supremacist and showing his pocketknife, but characterized his comments and actions as a joke and a way to avoid jury duty. Juror Three only remembered seeing the pocketknife. The district court removed Juror C.C. from the jury. Defense counsel moved for a mistrial, concerned that only one juror had reported Juror C.C. and that this failure to report suggested a tolerance for racism by other jurors. The district court denied the motion.

At trial, the State objected when defense counsel questioned Officer Scott Gerlicher, the State's lead investigator, about his report documenting a conversation with Tashawn Griffin that was disclosed just before trial. The bench discussion revealed that Griffin had told Wagenpfeil that Brown sold "fake dope" and that a friend of hers had told her that shortly before the shooting four men had come looking for Brown about the "fake dope" he had sold them. Defense counsel argued that Griffin's statements should be provided to the jury to show that alternative theories were not investigated, but the statements were excluded as hearsay.

Williams was ultimately convicted of first-degree murder based upon the following evidence developed at trial.

On July 21, 1995, Artis T. Brown, Jr. was riding a bicycle at the corner of Pleasant Avenue and 31st Street in Minneapolis.

Another bicyclist approached and fired five shots, killing Brown.

Police questioned witnesses at the scene. From his second-story apartment window overlooking Pleasant Street, Lloyd Anderson saw the shooter's right hand go up and jerk, but did not see a gun. Anderson reported that the shooter fled east on his bicycle. Anderson's 13–year–old niece, A.M., was outside and saw the shooter's side profile and that he had a gun. Both Anderson and A.M. recognized the shooter but did not remember his name. A third witness, Yolanda Bowers, observed the shooting from a half block away. She saw the shooter and saw him pull out a gun and shoot. At the scene, she described the shooter to police as a black male with an afro who was a "fat slouch" and wore a white shirt and dark jeans. At trial, Bowers testified that the shooter wore a black shirt.

Rosalind Bakion observed the shooting from her vehicle. She drove an ice-cream truck in the neighborhood and recognized the shooter as a big spender. Bakion made eye contact with the shooter, and she was worried because he looked her in the face. When interviewed by police, Bakion recalled that she saw the shooter pull a gun, shoot, and recoil, but at trial she could not remember if she saw the actual shooting or a gun. She described the shooter as having striped tan and brown shorts and was sure that he fled west, not east, on his bicycle. Police also spoke with two other witnesses, Paul Howards and Timothy Wilson, who did not see the shooting but observed someone peddling west on a bicycle just after the shooting. Howards described the bicyclist as a 16–year–old male on a dark mountain bike with a "dark, flat, black complexion" and wearing a baggy light shirt, dark baggy pants with a plaid-type pattern, and a "cabby-type hat."

Soon after the shooting, police apprehended a suspect headed west on a black bicycle. The suspect had a medium to thin build and wore black jeans and a white t-shirt. He was questioned and released.

Sergeant Jim Kaju, who worked in the neighborhood where the shooting occurred, identified individuals who met the description of the shooter that Bowers and Anderson provided. Gerlicher used these individuals to prepare a photo lineup, but Bakion could not identify the shooter in this lineup. Kaju provided additional suspects after learning that the victim had recently fought with "Doughboy." But A.M. and Anderson did not recognize the shooter in the second lineup. Gerlicher then spoke with his wife, who worked in the Juvenile Division, and learned that Williams, who matched the description, had been arrested four days earlier for narcotics possession near where the shooting occurred, but that he was not charged because the narcotics were fake. Based on this information, Gerlicher prepared a third photo lineup and A.M. identified Williams in this lineup. Gerlicher changed the order of the photos. Subsequently, both Anderson and Bowers identified Williams as the shooter. Based on the identification by Anderson, A.M., and Bowers, Williams was arrested. At trial, Anderson and A.M. testified that Williams was the shooter. Bakion could not identify the shooter from either the third or fourth lineups, but testified that it was not Williams.

After Williams was taken into custody, his probation officer, Hargraves, visited him. Williams told Hargraves that Brown had a lousy reputation for selling fake drugs. Later, in jail, Williams approached Derick Amundson, who was looking at an outdoor magazine, and, commenting on a

nine-millimeter Glock or .45 Glock,[1] said, "[t]hat looks like the gun I had." Williams proceeded to tell Amundson that Brown had sold him fake narcotics a couple of weeks before and that he had shot Brown. He told Amundson that he would have his family testify that he was not at the scene and that he might try to frame a friend. Amundson shared the information with his fiancée, who then notified Gerlicher.[2]

The jury found Williams guilty of one count of first-degree murder, and the district court imposed a sentence of life imprisonment. On direct appeal, Williams argued that (1) exclusion of statements by Willis and Griffin about Brown's practice of selling fake crack deprived him of his right to present a defense; (2) statements by Willis and Griffin fell within a hearsay exception and were admissible; (3) the district court erred by permitting the State's rebuttal testimony; and (4) the State's closing argument mischaracterized evidence and made claims not supported by evidence. *State v. Williams*, 586 N.W.2d 123, 124, 126 (Minn.1998). We affirmed Williams' conviction on direct appeal. *Id.* at 127.

Williams petitioned for postconviction relief, claiming that: (1) the district court erred by not removing a biased juror; (2) the prosecutor committed misconduct by failing to disclose several police reports until just before trial; (3) the district court erred by refusing defense counsel's request for a four-day continuance; (4) defense counsel was ineffective as a result of failure to object to a biased juror's continued service, failure to object to prosecutorial misconduct or accept the two-day continuance that the district court offered, and failure to fully investigate Williams'

case; and (5) appellate counsel was ineffective because of failure to pursue the ineffective assistance of counsel claims. In addition, Williams claimed that appellate counsel was ineffective because appellate counsel did not request a transcript of the jury questioning and did not question Williams in an age-appropriate way. The district court denied Williams' petition without an evidentiary hearing, concluding that Williams' claims were *Knaffla*-barred or otherwise lacked merit. Williams appealed to this court.

## I.

■ A defendant convicted of a crime may file a petition for postconviction relief. Minn.Stat. § 590.01, subd. 1 (2008). A postconviction court must conduct an evidentiary hearing on a petition "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1 (2008); *see also Ives v. State*, 655 N.W.2d 633, 635 (Minn.2003). Allegations in a postconviction petition must be more than argumentative assertions without factual support. *Leake v. State*, 737 N.W.2d 531, 535 (Minn.2007).

■ If a direct appeal has been taken on a conviction, all claims raised in that appeal, and all claims known or that should have been known at the time of that appeal, are procedurally barred and will not be considered in a subsequent petition for postconviction relief. *State v. Knaffla*, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (Minn. 1976); *Leake*, 737 N.W.2d at 535. The *Knaffla* bar is subject to two exceptions: an issue may be considered (1) if it is so novel that its legal basis was not reasonably available at the time of the direct

---

1. The gun used in the shooting was never recovered. At trial, a forensic scientist testified that the gun was likely a nine-millimeter semi-automatic weapon.

2. Amundson's criminal history includes 11 felony convictions.

appeal, or (2) when fairness so requires and the petitioner did not deliberately and inexcusably fail to raise the issue on direct appeal. *Roby v. State*, 531 N.W.2d 482, 484 (Minn.1995).

## II.

■ Williams first alleges that the district court erred in allowing Juror Three to serve because Juror Three was actually and impliedly biased, as demonstrated by his refusal to admit that he heard Juror C.C.'s racial-supremacy statement. Williams alleged that Juror Three obviously heard the statement, as Juror Three talked with Juror C.C. and admitted seeing the pocketknife. The postconviction court concluded that Williams' claim was *Knaffla*-barred. On appeal, Williams argues that his claim is based on newly discovered evidence because his appellate counsel did not order or review the "partial trial transcript" or tape that contained the juror questioning and determination that Juror Three was not biased, and the "trial transcript" that appellate counsel did review did not discuss Juror Three. But Williams' claim is based on events that occurred at trial and not newly discovered evidence. Any failure to discover the evidence was a direct result of failure to be diligent, as Williams himself later argues. Because the claim could have been brought on direct appeal, *Knaffla* bars Williams' claim.

■ Williams also argues that his claim falls within *Knaffla's* fairness exception because a biased juror affects the fundamental fairness of a trial. After learning of Juror C.C.'s comments, the district court interviewed each juror individually. The court then denied the motion for a new trial made by defense counsel, concluding that the jurors could be "fair and impartial." We generally defer to the district court's determination of bias. *State v. Young*, 710 N.W.2d 272, 282 (Minn.2006).

■ Williams argues that Juror Three was either actually or impliedly biased and thus he did not receive a fundamentally fair trial. Actual bias "is a state of mind on the part of the juror, in reference to the case or to either party, which would prevent the juror from trying the issue impartially and without prejudice to the substantial rights of either party." *State v. Brown*, 732 N.W.2d 625, 629 n. 2 (Minn.2007). Implied bias is "conclusively presumed as a matter of law." *Id.* It assumes certain relationships or experiences create a mindset that cannot be changed or set aside. *Id.* Courts from other jurisdictions have found implied bias in " 'extreme situations where the prospective juror is connected to the litigation at issue in such a way that is highly unlikely that he or she could act impartially during deliberations.' " *Id.* at 629–30 n. 2 (quoting *Hunley v. Godinez*, 975 F.2d 316, 319 (7th Cir.1992)). Racial bias is generally analyzed within the actual-bias category but in some cases a juror's admitted bias is so strong that, like implied bias, it is not subject to rehabilitation. *Id.* Minnesota has not adopted the theory of implied bias and we see no reason to do so here. While Williams insists that Juror Three lied about what he heard, Williams' claim that Juror Three was actually or impliedly biased is not supported by any evidence that Juror Three lied or that he was racially biased. Therefore, Williams' claims fail as "mere argumentative assertions."

■ Second, Williams contends that the State engaged in misconduct by failing to make pretrial disclosures of Officer Wagenpfeil's police report that contained statements by Griffin that a friend had told her four men were looking for Brown because he had sold them fake drugs. The post-

conviction court held that Williams' claim was *Knaffla*-barred.

Although the late disclosures appear on the record and could have been subject to direct appeal, Williams argues that because the late disclosure generated newly-discovered alleged violations, specifically, the district court's denial of a four-day continuance, and the refusal by defense counsel to accept the offered two-day continuance, his claim should fall within *Knaffla's* fairness exception.

Williams argues that he was prejudiced by the late disclosure because it hindered trial preparation. He contends that had Wagenpfeil's report been disclosed sooner, his counsel would have spoken with Wagenpfeil, Griffin, and Griffin's friend and called them as witnesses. Because Williams' conviction was based almost solely on eyewitness identification, some of which was conflicting, Williams contends that additional information from these three individuals, especially about the four people looking for Brown, could have uncovered other suspects. We disagree.

We conclude that Williams' claim is *Knaffla*-barred because Williams could have raised it on direct appeal. It does not fall within *Knaffla's* fairness exception because the district court offered Williams a continuance to remedy any prejudice and there is no showing that the offered two-day continuance was insufficient time for defense counsel to investigate.

■ Williams also contends that the State has yet to disclose all police reports. The postconviction court concluded that this claim was *Knaffla*-barred. On appeal, Williams did not develop this claim, but did allege that the State has not disclosed police records about a third bicyclist reported by several witnesses. As Williams knew about this claim at the time of his direct appeal, because it is based on the trial record, the claim is *Knaffla*-barred.

■ Third, Williams argues that the postconviction court erred in concluding that *Knaffla* barred his claim that the district court should have granted his request for a four-day continuance. Williams argues that this claim is not *Knaffla*-barred because the four-day continuance request was discovered in 2003, after his direct appeal. We need not decide whether this claim is *Knaffla*-barred because Williams has not established that the district court's refusal to grant a four-day continuance had a material impact on the outcome of his trial. Nor does he contend that the offered two-day continuance would not have allowed enough time for defense counsel to investigate. The district court has discretion to grant a motion for a continuance and its decision will not be reversed absent an abuse of discretion. *Dunshee v. Douglas*, 255 N.W.2d 42, 45 (Minn.1977). We consider whether the denial so prejudiced the preparation of an adequate defense that it materially affected the trial's outcome. *State v. Miller*, 488 N.W.2d 235, 239 (Minn. 1992). Williams' claim fails because he makes no showing of either materiality or that the outcome at trial would have been any different had a four-day continuance been granted.

### III.

■ We turn next to Williams' claims of ineffective assistance of both trial and appellate counsel. We review claims of ineffective assistance of counsel de novo. *Opsahl v. State*, 677 N.W.2d 414, 420 (Minn.2004). To establish ineffective assistance of counsel, Williams must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that the outcome would have been different but for counsel's errors. *State v.*

*Rhodes,* 657 N.W.2d 823, 842 (Minn.2003) (citing *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). We need not analyze both prongs if either one is determinative. *Id.* Trial counsel's performance is presumed to be reasonable. *Schneider v. State,* 725 N.W.2d 516, 521 (Minn.2007). Trial counsel's performance is objectively reasonable when counsel exercises the "customary skills and diligence" that a reasonably competent attorney would under the circumstances. *Opsahl,* 677 N.W.2d at 421. Under prong two, to show prejudice, the defendant must undermine confidence in the trial outcome by demonstrating that but for the errors the result of the proceeding probably would have been different. *Rhodes,* 657 N.W.2d at 842. We review the totality of the evidence to determine prejudice. *Id.*

Williams contends that both his trial and appellate counsel were ineffective. The State counters that Williams' claims are "accusatory assertions" without any supporting evidence. The postconviction court concluded that Williams' claims were simply a reformulation of his previous claims and were therefore *Knaffla*-barred. We conclude that all of Williams' ineffective assistance of trial counsel claims fail either the *Strickland* performance prong, the prejudice prong, or both.[3] And, because we conclude that all of Williams' ineffective assistance of trial counsel claims fail, we also conclude that all of Williams' ineffective assistance of appellate counsel claims that allege ineffective assistance of trial counsel also fail.

■■■ Williams first argues that trial counsel was ineffective because of failure to object to Juror Three's service. But ineffective representation is not estab-

lished by complaining that counsel failed to challenge certain jurors unless the failure to challenge jurors essentially amounts to a denial of counsel. *State v. Russell,* 272 Minn. 463, 465, 138 N.W.2d 690, 692 (1965). The failure to challenge Juror Three does not amount to such denial, especially because, as noted earlier, we conclude that there was no evidence of bias on the part of Juror Three.

■■■ Second, Williams argues that his defense counsel was ineffective as a result of failure to object to the State's late disclosures. We do not decide whether defense counsel should have objected to the late disclosures because we conclude that counsel's failure to object did not result in prejudice. *See State v. Dobbins,* 725 N.W.2d 492, 513 (Minn.2006). Williams has not alleged or provided evidence that the offered two-day continuance was insufficient to remedy any prejudice from the late disclosure.

■■■ Third, Williams argues that his defense counsel was ineffective because of failure to accept the offered two-day continuance. But Williams cites no evidence indicating that a continuance was necessary in order to contact the prospective witnesses or for any other reason. Notably, defense counsel attempted to locate another witness, whose full name was disclosed at the same time as Wagenpfeil's report, even though counsel did not obtain a continuance. Thus we conclude that this claim is an argumentative assertion without any factual support.

■■■ Fourth, Williams argues that his defense counsel was ineffective because of failure to request reports that the State has yet to provide. The claim has no

---

**3.** Because each of Williams' ineffective assistance of trial counsel claims is entirely without merit, we have elected to dispose of them

on their merits and not determine whether these claims are barred by our *Knaffla* rule.

merit as it constitutes argumentative assertions without any factual support.

Fifth, Williams argues that his defense counsel was ineffective because of failure to question Wagenpfeil, Griffin, or Griffin's friend. Trial strategy, which we do not generally review, includes the extent of counsel's investigation. *Opsahl,* 677 N.W.2d at 421. But we will examine trial strategy when it implicates fundamental rights. *Erickson v. State,* 725 N.W.2d 532, 536 (Minn.2007). Criminal defendants have a fundamental right to a fair trial. *State v. Dorsey,* 701 N.W.2d 238, 252 (Minn.2005).

When determining whether alleged failure to investigate constitutes ineffective assistance of counsel, we consider whether the decision was based on trial strategy or whether it demonstrated that counsel's performance fell below an objective standard of reasonableness. *Opsahl,* 677 N.W.2d at 421 (defense counsel's failure to investigate two alternative suspects was trial strategy when police had abandoned their investigation of those suspects); *Hodgson v. State,* 540 N.W.2d 515, 518 (Minn.1995) (defense counsel's decision not to present evidence that someone else may have committed the murder and not to investigate leads was trial strategy).

" 'A court must [also] assess the evidence that a proper investigation would have discovered and determine whether that evidence likely would have changed the outcome of the trial.' " *Gates v. State,* 398 N.W.2d 558, 562 (Minn.1987) (citing *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). In *State v. King,* the defendant was convicted primarily on eyewitness testimony. 296 Minn. 306, 312–13, 208 N.W.2d 287, 291–92 (1973). The state did not disclose a police report that contained a discarded police lead. *Id.* at 312, 208 N.W.2d at 291. We concluded that defendant was not deprived of an evidentiary lead because the information was not substantially likely to lead to significant exculpatory evidence. *Id.* at 315–16, 208 N.W.2d at 293. *See also Gustafson v. State,* 477 N.W.2d 709, 713 (Minn. 1991) (defense counsel is not required to pursue leads not reasonably likely to produce favorable evidence); *Gates,* 398 N.W.2d at 562–63 (defense counsel is not required to interview all individuals named in the police report).

Because Williams' conviction was based almost solely on eyewitness identification, some of which was conflicting, he argues that additional information from Wagenpfeil, Griffin, and Griffin's friend, particularly about the four people that had been looking for Brown, could have identified other suspects. He argues that had his defense counsel called Wagenpfeil, Griffin, or Griffin's friend to testify, there is no doubt that the outcome of his trial would have been different. The record is silent as to why these individuals were not contacted by defense counsel. But even if the investigation was not as thorough as it should have been, Williams has not demonstrated that their testimony would have made any difference in the outcome; indeed he offers no evidence as to what any additional investigation would have produced. Therefore, we conclude that the decision not to call these witnesses was trial strategy that did not implicate Williams' fundamental right to a fair trial.

Williams argues that his appellate counsel was ineffective, first, because of failure to allege the ineffective assistance of trial counsel claims discussed above. But appellate counsel is not required to raise claims on direct appeal that counsel could have legitimately concluded would not prevail. *Leake,* 737 N.W.2d at 536. As Williams' ineffective assistance of trial counsel claims are without merit, appellate

counsel was not ineffective in failing to bring the claims.

■ Second, Williams claims that appellate counsel was ineffective because of failure to order the "partial trial transcript" or listen to the audio tape of the juror questioning. But appellate counsel is not required to raise claims on direct appeal that appellate counsel legitimately concluded would not prevail. *Leake*, 737 N.W.2d at 536. Because there is no evidence that Juror Three was biased, Williams was not prejudiced by the failure to request the transcript.

Third, Williams claims that appellate counsel was ineffective because of failure to speak with defense counsel to discover claims that should have been raised on direct appeal. But to the extent that Williams' claims come from the district court record, appellate counsel's decision not to bring the claims does not establish ineffectiveness. To the extent that the claims do not appear in the record, Williams has not established that those claims have merit and, therefore, he was not prejudiced.

■ Finally, Williams alleges that appellate counsel failed to question him in a manner appropriate for his age. He states that he cried for a majority of the hour that counsel visited with him and that, at 17, he lacked the ability to know what trial issues should be appealed. But Williams fails to demonstrate that his counsel's representation was ineffective or that he would have prevailed on his appeal but for the alleged errors. We therefore conclude that Williams' claim is without merit.

We affirm the postconviction court's denial of postconviction relief.

Affirmed.