STATE OF MINNESOTA

IN SUPREME COURT

A13-2381

Nobles County                                                    Lillehaug, J.


State of Minnesota,

        Respondent,

vs.                                                          Filed: April 22, 2015
                                                      Office of Appellate Courts
Josue Robles Fraga,

        Appellant.

_____

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, Saint Paul, Minnesota; and

Kathleen Kusz, Nobles County Attorney, Worthington, Minnesota, for respondent.

Steven P. Russett, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____


S Y L L A B U S

    1.    Minnesota Rule of Criminal Procedure 26.02 provides the exclusive grounds to challenge a juror for implied bias. A juror's knowledge that a previous trial on the same charges ended in conviction does not constitute implied bias.

    2.    The presence of an actually biased juror who sits in judgment of the defendant is structural error. Because a juror expressed bias during voir dire, was not adequately rehabilitated, and sat in judgment, a new trial is required.

1

3. Our court has adopted Minn. Stat. § 634.20 (2014) as a rule of evidence to allow the admission of evidence of domestic conduct by the accused against household and family members other than the victim.

Reversed and remanded.

O P I N I O N

LILLEHAUG, Justice.

Josue Robles Fraga was charged with and convicted of three counts of murder in connection with the death of his 2-year-old niece, S.R. While an appeal was pending in our court, new evidence was identified and the district court granted a new trial. Fraga was then charged with and convicted of five counts of murder.

Fraga appeals to our court, arguing that the district court committed reversible error in the retrial when it: (1) seated two jurors who knew that the first trial had resulted in a conviction; (2) seated a juror actually biased against the defendant; (3) denied Fraga's motion for a change of venue; (4) admitted into evidence a newspaper article that referred to the first trial and included information about an alternative perpetrator; (5) precluded the testimony of a defense expert witness as a sanction for discovery violations; and (6) admitted evidence under Minn. Stat. § 634.20 (2014) of Fraga's alleged sexual abuse of a relative. Fraga also argues that the district court erroneously entered convictions for all five counts of murder.

We hold that the district court did not err when it seated jurors who knew about the first conviction. However, we hold that the district court committed reversible error when it allowed a juror who exhibited actual bias against the defendant and was not

2

adequately rehabilitated to sit in judgment of the defendant.  Therefore, we reverse and remand for a new trial.  In the interest of judicial economy, we also address three of the other issues raised by Fraga on appeal.

## I.

This murder case arises out of the horrific death in March 2008 of a 2-year-old girl, whose initials were S.R.[1]  S.R. and her brother lived in Worthington with their uncle, Fraga, his wife, and their four children, who we will call Child A, Child B, Child C, and Child D.  The six children shared a bedroom in the mobile home.  Fraga's wife worked outside the home while Fraga cared for the children.

Around 2:30 a.m. on March 20, 2008, Fraga picked up his wife from work.  They ate, watched television, and went to bed.  Some time later Fraga woke up his wife and told her that "something was happening with [S.R.]."  He handed S.R. to his wife, who noticed that S.R. felt loose and limp.  She put a diaper on S.R. and wrapped her in a blanket.  Fraga and his wife took S.R. to the hospital, arriving at 5:35 a.m.

Fraga informed the receptionist that "[m]y baby just stopped breathing."  An EMT checked S.R. for signs of breathing, but found none.  The EMT noted that S.R. felt cold; her temperature was 84 degrees.  The EMT brought S.R. to the emergency room, where he and other medical personnel performed CPR.  The medical staff noticed bruises on

---

[1]    In this Section I, we summarize the background of an investigation, indictment, and two first-degree murder trials which together span more than 5 years.  We also detail the facts underlying the six primary issues raised on appeal, some of which may be confronted in a third trial.  This summary necessarily includes disturbing, graphic narrative about the alleged crime and alleged violent, sexual domestic conduct against others.

S.R.'s forehead and knees, and that S.R.'s stomach was distended and discolored. Additionally, a nurse who checked S.R.'s temperature rectally noted that it "looked like a firecracker had gone off in her rectum." S.R. had rectal prolapse: a protrusion of internal tissue that came out through the rectum.

While the hospital staff tried to resuscitate S.R., the emergency room doctor questioned Fraga and his wife about the child's injuries. Fraga told the doctor that S.R.'s brother had jumped off of the bunk bed and onto S.R. Given the extent of distension displayed on S.R.'s stomach, the doctor did not believe that a 3-year-old child could cause the injury, "unless he was jumping off of a large cliff." S.R. was declared dead, and the medical staff notified law enforcement of suspected child abuse.

A detective brought Fraga and his wife to the Prairie Justice Center to interview them. Fraga said that S.R. and her brother were always fighting, and that her brother "had this thing about jumping on her." Fraga said that sometimes he would have to wake up in the middle of the night to stop them from fighting. According to Fraga, on the night of the incident, he arrived home with his wife at 2:30 a.m. and checked on the kids, and everything seemed fine. Fraga noticed that S.R. had a bruise on her head, but surmised that she had received it from her brother. After going to bed, Fraga said he later woke up to go to the bathroom, and heard what he thought to be S.R. and her brother fighting. When Fraga looked into the bedroom, he saw S.R. on the floor and her brother jumping on her with his knees. Fraga said he picked up S.R. and she felt "loose," so he woke up his wife and they brought S.R. to the hospital.

4

While talking with Fraga, the detective noticed a reddish-brown stain on Fraga's pant leg. Fraga told the detective that it was feces, and this was later confirmed by the Bureau of Criminal Apprehension (BCA) lab. Fraga said that the feces were present because he had been cleaning the bathroom in those pants. Upon questioning, Fraga denied ever sexually abusing or penetrating S.R.

Police were sent to the Fraga home. The other five children were still there, and Child A let the police in. The police gathered the children to bring them out of the house. Before they left, Child A went to use the bathroom. He appeared to be very anxious and nervous. According to the officer, it sounded like Child A vomited while in the bathroom. The police then took the children to the police department, where they interviewed both Child A and Child B. When they interviewed Child A, he denied ever sexually touching S.R. or knowing anything about her death. Child A did not mention anything about S.R.'s brother jumping on her. Following the interviews, the five children were taken to a foster home.

That same day, a detective executed a search warrant and seized Child A's clothing and a DNA sample. The detective left his business card with Child A, and told him to call if he had any additional information. That evening, Child A called the detective and told him that he had seen S.R.'s brother jumping on her. The detective was suspicious, and confirmed with the foster parent that Child A had received a phone call. The detective discovered that the call had come from the motel where Fraga was staying pending the investigation. Child A admitted that the call was from his father, who had asked him to tell the police that he had seen S.R.'s brother jumping on her.

5

When police searched the Fraga house, they discovered considerable amounts of feces and semen. S.R.'s pajama pants and sweatpants were found in the bathtub and contained both feces and Child A's semen.[2] A sock found next to a garbage can in the master bedroom had both feces and Fraga's semen on it. A black t-shirt apparently belonging to Fraga also had feces on it. No feces were found on Child A's clothing.

The police also discovered several children's notebooks that contained violent sexual sketches, including a drawing of a girl being stabbed to death and saying "I Am Dieing." Child B did not remember if she had drawn that picture, but guessed that she had because it looked like her handwriting.

An autopsy was performed on March 21, 2008. In the medical examiner's opinion, S.R. died between 9:30 p.m. and 1:30 a.m., before Fraga's wife came home and 4 to 8 hours before the child was brought to the hospital. There were contusions to S.R.'s head and her extremities. The medical examiner concluded that S.R. died from a traumatic head injury due to physical assault. In addition, S.R.'s stomach was distended and had actually ruptured, spilling stomach contents inside her abdominal cavity. Because S.R.'s abdomen area did not have contusions or abrasions, the medical examiner concluded that the stomach injuries were caused by a compressive force: being pressed against something. S.R. also had lacerations on her face and injuries to her lower frenulum, suggesting to the medical examiner that somebody manipulated her mouth, probably to keep her quiet. S.R. also had swollen sexual organs and a prolapsed rectum.

---

[2]     The diaper that S.R. wore to the hospital also contained semen. However, the semen was not from Fraga or Child A, and police did not identify a source.

She had a hemorrhage more than 2 inches long inside her rectum, most likely the result of penetration or trauma to the area. Given the evidence of sexual assault, the medical examiner looked for semen deposits, but did not find any in or on S.R.'s body.[3]

All of the children except Child A were brought to a clinic on March 21, 2008, for a medical examination, but the doctor did not find any physical evidence that they had been sexually abused or assaulted. However, the foster parent who cared for the children immediately following S.R.'s death notified a social worker that S.R.'s brother had told her that he had been sexually abused by Fraga.

Investigators also learned that Fraga's brother, S.R.'s father, had contacted social services in Texas before S.R.'s death and told them that Fraga sexually abused him when they were children. The brother informed the social worker in Texas of the sexual abuse because he was trying to regain custody of his children. When interviewed on February 1, 2008, by a social worker in Nobles County, Fraga denied that he had sexually abused his brother.

A grand jury indicted Fraga on three counts of murder. Following a trial, Fraga was convicted on all counts, and appealed to our court.

While Fraga's appeal was pending, the State learned and disclosed that, after the trial, Child A admitted having had sexual contact with S.R. At the first trial, Child A testified that he had never touched S.R. sexually. He later admitted during an ongoing child protection case that he had touched S.R. sexually 15 to 20 times, but Child A

---

[3]     Nor did the BCA lab find semen on vaginal, rectal, or oral swabs of S.R.

claimed that he had never penetrated her. He also admitted sexually touching S.R.'s brother 5 to 10 times.

At Fraga's request, we stayed his appeal. Fraga then moved the district court for postconviction relief, arguing that if Child A had testified truthfully, the jury might have instead reached the conclusion that Child A, not Fraga, had killed S.R. The district court ordered a new trial.[4]

The State also discovered and disclosed that Child B had given false testimony at the first trial. Child B testified at the first trial that she did not witness S.R.'s murder. However, after the trial, she wrote a letter to a friend giving a much different story. In the letter, she wrote about years of sexual abuse by her father. She also claimed to have witnessed the murder of S.R. firsthand, identifying her father as the perpetrator.

The State then sought, and a grand jury returned, an amended indictment for five counts of murder: (1) first-degree murder involving criminal sexual conduct; (2) first-degree murder involving child abuse; (3) first-degree murder involving domestic abuse; (4) second-degree murder involving criminal sexual conduct; and (5) second-degree murder involving first-degree assault.

Prior to each of his two trials, Fraga unsuccessfully moved for a change of venue, citing extensive media coverage and the responses to jury questionnaires. During voir dire at the second trial, Fraga took the position that if a potential juror knew that Fraga had been convicted in the first trial, the juror should be automatically excused. Fraga

---

[4]     Based on the new trial, we dismissed Fraga's first appeal to this court. *State v. Fraga*, Order (Minn. filed July 25, 2012).

8

also unsuccessfully moved for a change of venue after exhausting his peremptory challenges. Fraga did not ask for any additional peremptory challenges. Ultimately, two jurors who arguably knew that Fraga had been convicted in the first trial were seated over Fraga's objections.

At the second trial, Child B testified that she had written the letter to her friend, but had asked her friend not to disclose it to anyone. Child B testified that she had been afraid to talk about her abuse and S.R.'s death, but wrote the letter after finding out from an online news article that her father blamed S.R.'s death on Child A. According to Child B, her earliest memory was her father "doing things" to her: touching her buttocks, vagina, and breasts, and sometimes penetrating her. Child B testified that her father tried to "rape" her the night of S.R.'s death, "like he usually did." Child B testified that when she refused, Fraga got mad and grabbed S.R. Fraga taped Child B to a chair, and started flushing S.R.'s head in the toilet. Child B testified that Fraga then brought S.R. to the bathtub and ran water over her face. Child B said that S.R. had a bowel movement due to the pressure put on her stomach. Fraga then let Child B go from the chair, and she went back to her bed. She said that she could still hear S.R. crying and gasping for air.

An expert witness for the State who had interviewed the Fraga children shortly after the incident stated that it would be unusual for children to talk about sexual abuse right away, and that "some children are never able to disclose about their abuse until they're adults," especially if the perpetrator is an authority figure or threatens physical violence. Fraga sought to have his own expert testify to rebut this witness and to

9

challenge Child B's changed testimony. The district court precluded the expert's testimony because of an undue delay in providing the requisite expert disclosure.

At the second trial, and contrary to his testimony at the first trial, Child A testified that he had touched S.R.'s breasts, vagina, and buttocks. He testified that he touched her 20 to 30 times, but denied ever penetrating her vagina or rectum. He also denied having anything to do with S.R.'s death.

The jury found Fraga guilty of all five counts of murder, and the district court entered conviction on five counts.[5] The district court imposed a sentence on the conviction of murder in the first degree. Fraga appealed to our court, arguing that the district court committed reversible error when it: (1) seated two jurors who knew that the first trial had resulted in a conviction; (2) seated a juror actually biased against the defendant; (3) denied Fraga's motion for a change of venue; (4) admitted a newspaper article that referred to the first trial and included information about an alternative perpetrator; (5) precluded the testimony of a defense expert witness as a sanction for discovery violations; and (6) admitted evidence under Minn. Stat. § 634.20 of Fraga's alleged sexual abuse of his brother. Fraga also argues that the district court erroneously entered convictions on more than one count of murder.

---

[5] The indictment charged Fraga with three counts of first-degree murder, and two counts of second-degree murder. The jury found Fraga guilty of each of these counts. However, the district court entered judgment on one count of first-degree murder and four counts of second-degree murder, apparently treating two of the first-degree charges as second-degree charges. The record does not explain why this occurred.

II.

We first must decide whether the district court erred when it seated two jurors who knew that Fraga's first trial had ended in conviction. Fraga asks us to hold that "a potential juror who knows that a defendant has been convicted of the same offense in a prior trial is 'automatically disqualified' from jury service." In other words, Fraga asks us to extend the doctrine of implied bias found in Minn. R. Crim. P. 26.02, subd. 5(1), and apply it to a juror's knowledge that a first trial ended in a conviction. We decline to do so.

Whether we should extend the implied-bias doctrine to knowledge of a conviction is a question of law. *See Williams v. State*, 764 N.W.2d 21, 28 (Minn. 2009). We review questions of law de novo. *See Ford v. State*, 690 N.W.2d 706, 712 (Minn. 2005).

Implied bias is a bias that is "conclusively presumed as a matter of law." *State v. Brown*, 732 N.W.2d 625, 629 n.2 (Minn. 2007). Implied bias assumes that "certain relationships or experiences create a mindset that cannot be changed or set aside." *Williams*, 764 N.W.2d at 28.[6] Other courts have found implied bias in "extreme situations where the prospective juror is connected to the litigation at issue in such a way that is highly unlikely that he or she could act impartially during deliberations." *Id.* (internal quotation marks omitted).

On several occasions, we have considered whether to extend the doctrine of implied bias. In the *Stufflebean* case, the defendant was charged with criminal sexual

---

[6] In *Brown*, we stated that "there may be cases in which a juror's admitted racial bias is so strong that, like implied bias, it is not subject to rehabilitation." 732 N.W.2d at 629 n.2. However, the issue of implied bias was not an issue on appeal in that case.

conduct. *State v. Stufflebean*, 329 N.W.2d 314, 316 (Minn. 1983). One of the seated jurors was an employee of a corporation owned in large part by the victim's family and whose president was the victim's father. *Id.* at 317. On appeal, the defendant argued that the district court erred by not striking that juror. *Id.* We disagreed, holding that "Rule 26.02 provides the exclusive grounds to challenge for implied bias," and that the relationship between the juror and the company was not one covered by Rule 26.02.[7] *Id.* at 318; *see also Williams*, 764 N.W.2d at 28 (declining to extend implied bias to a juror who may have lied about another juror's racist remarks);[8] *Holt v. State*, 772 N.W.2d 470, 477 (Minn. 2009) (declining to extend the doctrine of implied bias where a juror's home was burgled, but there was no connection between the defendant and the attempted burglary, and the case involved a different type of crime).

Based on a U.S. Supreme Court case, Fraga argues that we should forgo our precedent and extend the implied-bias doctrine beyond the rule to the situation of a juror knowing of a prior conviction. In *Leonard v. United States*, the entire jury panel for a second case against a defendant was present when the jury in the first case announced its

---

[7]  Subdivision 5 sets outs 11 grounds on which one may challenge a juror for cause. Knowledge of a prior conviction is not one of the 11, unless it constitutes actual bias: that the juror's state of mind "satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the challenging party." Minn. R. Crim. P. 26.02, subd. 5(1).

[8]  While in *Williams* we stated that "Minnesota has not adopted the theory of implied bias," 764 N.W.2d at 28, in *Stufflebean* we characterized Rule 26.02 as providing a method to challenge a juror for implied bias, 329 N.W.2d at 318. We follow *Stufflebean* and consider Fraga's argument as a request to extend implied bias beyond the grounds in Rule 26.02.

guilty verdict in open court. 378 U.S. 544, 544 (1964). The Supreme Court held that the trial court erred by having the second jury panel present. *Id.* *Leonard* is distinguishable, as mere knowledge of a first conviction in a retrial is significantly different than a procedure in which every juror hears the first guilty verdict in open court. A juror's knowledge of a first conviction, without more, does not present an "extreme" situation in which "the prospective juror is connected to the litigation at issue in such a way that is highly unlikely that he or she could act impartially during deliberations."[9] *Brown*, 732 N.W.2d at 629 n.2 (internal quotation marks omitted).

We have already described in Rule 26.02 the circumstances when prospective jurors are too connected to the case at issue to sit. Under the rule, a juror is considered biased if the juror, among other things: (1) served on the grand jury that found the indictment or an indictment on a related offense; (2) served on any jury previously sworn to try the pending charge; or (3) served as a juror in any case involving the defendant. Minn. R. Crim. P. 26.02, subd. 5(1). None of these grounds is implicated here.

Thus, we decline to hold that a juror in a retrial who knows that the first trial ended in conviction is impliedly biased as a matter of law. Instead, we continue to follow *Stufflebean*'s holding that Rule 26.02 provides the exclusive grounds to challenge a prospective juror for implied bias.

---

[9]    A juror with knowledge of a first conviction could still be challenged for *actual* bias. *See* Minn. R. Crim. P. 26.02, subd. 5(1).

## III.

Fraga next argues that the district court erred when it seated a particular juror who was actually biased. We will identify the juror as "Juror M." "Actual bias is a question of fact which the district court is in the best [position] to evaluate." *State v. Evans*, 756 N.W.2d 854, 870 (Minn. 2008) (internal citations omitted). We give "great deference to a district court's findings of fact" regarding juror bias, *id.*, and review a district court's decision to seat a juror for abuse of discretion. *State v. Munt*, 831 N.W.2d 569, 577 (Minn. 2013).

### A.

The United States Constitution and the Minnesota Constitution guarantee a criminal defendant the right to an impartial jury. *State v. Greer*, 635 N.W.2d 82, 87 (Minn. 2001). "The bias of a single juror violates the defendant's right to a fair trial," because the "impartiality of the adjudicator goes to the very integrity of the legal system." *Brown*, 732 N.W.2d at 630. Permitting a biased juror to serve is structural error requiring automatic reversal. *State v. Logan*, 535 N.W.2d 320, 324 (Minn. 1995).

Minnesota Rule of Criminal Procedure 26.02, subdivision 5, provides the standard for determining actual bias. *Munt*, 831 N.W.2d at 576-77. A juror may be challenged for cause if his or her "state of mind—in reference to the case or to either party—satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the challenging party." Minn. R. Crim. P. 26.02, subd. 5(1). To prove actual bias, "the challenging party must show that the juror exhibited 'strong and deep impressions' that would prevent her from 'lay[ing] aside [her] impression or opinion' and

14

'render[ing] a verdict based on the evidence presented in court.' " *Munt*, 831 N.W.2d at 577 (alteration in original) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722-23 & n.3 (1961)).

Determining whether the district court erred in this case is a two-step process. We must first determine if the juror expressed actual bias. *Id.* at 579. To do so, we must view the juror's voir dire answers in context. *Id.* at 578. If the juror expressed actual bias, we must then determine whether the juror was properly rehabilitated. *State v. Prtine*, 784 N.W.2d 303, 310 (Minn. 2010). We consider a juror to be rehabilitated if he or she "states unequivocally that he or she will follow the district court's instructions and will set aside any preconceived notions and fairly evaluate the evidence." *Id.*

B.

Even giving great deference to a district court's findings on juror bias, we must conclude that, in this case, the district court abused its discretion by seating Juror M.

Juror M disclosed on the juror questionnaire that his mother-in-law was a nurse who worked in the emergency room at the hospital to which S.R. was taken. She arrived for work later in the morning after S.R. was pronounced dead.

During voir dire, Juror M disclosed that he knew about the case, had read about it in the newspaper, and had discussed it with family or friends, including the case details. The district court asked him directly: "can you put all of that aside and decide the case solely based upon what is presented here in the courtroom?" Juror M's answer was not unequivocal. He responded: "*Yes, I guess.*" (Emphasis added.)

Shortly thereafter, the district court asked: "Do you know of any reason that you could not be fair and impartial?" Juror M again answered equivocally: "*Besides the fact*

15

*I know about the case, I don't, no. I think it would be hard."* (Emphasis added.) The

following exchange occurred:

> Court: Well, it is going to be hard for all the jurors.
> Juror M: I understand.
> Court: The question is whether you can be fair and impartial and decide the case based on the evidence that is presented here in the courtroom.
> Juror M: *I guess I could do that, yes.*

(Emphasis added.) Again, Juror M's response was equivocal.

During voir dire by defense counsel, Juror M confirmed that he had spoken about

the case with "all family," including his wife's parents. When asked directly whether his

mother-in-law had shared "any observations that she made at the hospital from that

morning," Juror M responded, "No," and that he "didn't know if she had any

involvement."

Juror M advised defense counsel that he understood what it meant to be fair and

impartial: "making a decision as if you were a third-person looking at it and not knowing

anything." The following exchange occurred:

> Counsel: When the Judge asked you about what you know about this case, you said that you would say, "I guess he is accused of murdering a small child." It sounds to me like maybe "accused" isn't a word you would use. What is your opinion about this case?
> Juror M: I don't know. It bothers me any time you are dealing with small children. I don't know. The details in the paper make it seem uncomfortable to be here and to talk about it. I guess, could you – I kind of forgot what you had asked.
> Counsel: That's all right. I was wondering if you have an opinion about this case.
> Juror M: Knowing that – I think this is a retrial. I would assume that – my only opinion would be that this is just happening out of a technicality of the law; that there was something – there was

16

either new evidence, or some part of the law, that was found that required that there be another trial.

Counsel also asked what kind of opinions Juror M's family or friends had shared. He responded that "their actions speak louder than words. The fact you cannot talk about it, or you feel uncomfortable talking about it, kind of speaks the magnitude of how they feel about it." He continued: "[T]he fact that it was a child, or, you know, the abuse part of it – I would say that that's what comes up most often. And, you know, it is sickening, you know, is probably the word I hear the most, or what comes to mind." Juror M then denied forming any opinion about Fraga, because "I have never met him."

Juror M also told defense counsel that he knew two of the witnesses on the witness list and that he would find them more believable based on that familiarity. When the State followed up, asking whether he would "automatically accept everything" one of the witnesses said, Juror M responded: *I can form my own opinion, I guess.*" (Emphasis added.) Again, the answer was equivocal. Then the State elicited a simple "yes" to a leading question: "So you would be able to base your decision on what you see and hear in the courtroom?"[10]

At this point, the defense had exhausted its peremptory challenges. Defense counsel made a motion to remove Juror M for cause, noting that Juror M had spoken extensively with family and friends, including his mother-in-law who had personal knowledge about what was happening at the hospital that morning. Defense counsel also

---

[10] One of the two witnesses Juror M knew was not called at trial. The testimony of the other, a nurse who had contact with S.R. and her brother a few weeks before S.R.'s death, was not materially harmful to the defense.

17

argued that Juror M had knowledge of the prior conviction and would find witnesses that he knew to be more believable. The State opposed the motion, arguing that Juror M did not learn from his mother-in-law what happened at the hospital; that Juror M understood that a new trial was required by new evidence, which was a fact; and that Juror M would base his decision on what happened in the courtroom. The district court denied the motion to remove Juror M for cause.

After the motion was denied, the State asked more questions. The dialogue included the following: "Is there any reason you can think of you couldn't be fair and impartial to both sides in this case, Mr. [M]?" Juror M answered: *"I don't think so."* (Emphasis added.)

Viewing the transcript of the voir dire of Juror M in its entirety, and with due deference to the district court, we conclude that Juror M expressed actual bias. He was asked whether there was any reason why he could not be fair and impartial. He responded: *"Besides the fact I know about the case, I don't, no. I think it would be hard."* On its face, the caveat "[b]esides the fact I know about the case" should have been considered an expression of bias. His ambiguous acknowledgement that "I think it would be hard" was probative of bias. Also probative was Juror M's statement that he had discussed the "details" of the case with his family and friends, that they had used the word "sickening" to refer to the matter, and that "sickening" was the word that came to his mind.

Nor was Juror M adequately rehabilitated. We require that, to be rehabilitated, a prospective juror must state "unequivocally" that the juror will set aside preconceived

18

notions and be fair. *State v. Logan,* 535 N.W.2d 320, 323 (Minn. 1995). Juror M's answers were repeatedly equivocal, including the phrases "yes, I guess," "I guess I could do that, yes," "I guess," "I can form my own opinion, I guess," "I don't think so," and (twice) "I don't know." We follow *Prtine*, 784 N.W.2d at 311, in which we held that rehabilitation was not adequate when the potential juror was equivocal when "given the opportunity to express her sentiments in her own words." *Id.* The same is true here.

## C.

If, as here, a juror is biased, is not adequately rehabilitated, and actually sits in judgment of the defendant, any conviction must be reversed. The State disagrees, and argues that even if a juror is biased, the defendant must show that "actual prejudice resulted from the failure to dismiss" the juror. It is true that we used the term "actual prejudice" in *Stufflebean*, 329 N.W.2d at 317. But we have squarely rejected the premise that *Stufflebean*'s reference to "actual prejudice" refers to a harmless-error standard. *See Logan*, 535 N.W.2d at 324. We have since held that "in challenging the seating of a juror, the appellant need only show that the juror was biased, not that the bias resulted in actual prejudice." *State v. Williams*, 593 N.W.2d 227, 238 (Minn. 1999) (citing *Logan*, 535 N.W.2d at 324); *see also Holt*, 772 N.W.2d at 477 (quoting *Logan*, 535 N.W.2d at 324). We reaffirm the holding of *Williams*. Our jury system rests on the premise that jurors must be unbiased. A conviction must be reversed if any juror actually biased sits in judgment. So this conviction must be reversed and remanded for a new trial.

IV.

In the interest of judicial economy, we discuss briefly three of the remaining issues raised by Fraga.[11]

Fraga's third issue, that the district court erred in denying his motion for a change of venue, is now moot because the conviction is reversed. But the issue may arise again upon motion of a party or on the district court's own initiative. The standard for deciding whether a change of venue is warranted is in Minn. R. Crim. P. 25.02, subd. 3, which provides: "A motion for . . . change of venue must be granted whenever potentially prejudicial material creates a reasonable likelihood that a fair trial cannot be had. Actual prejudice need not be shown."

Fraga's fourth issue relates to the admission into evidence of a newspaper article that referred to his previous trial and included information about an alleged alternative perpetrator. The headline of the article as admitted states "[Redacted] trial possible in Fraga case," and the text indicates that testimony and evidence were received in a court proceeding. The text contains statements from experts who did not testify in the second trial. Fraga concedes that the existence of the newspaper article was relevant to a limited extent, but argues that admitting the article itself was unfairly prejudicial under Minn. R. Evid. 403.

Whether this evidentiary issue will arise in a new trial depends on whether (and when) the State insists on offering the article. If it does, determining precisely which part

---

[11]    In light of our holding today, it is not necessary to discuss the expert witness preclusion issue and the judgment of conviction.

of the article's content is probative, is not inadmissible hearsay, and is not substantially outweighed by the danger of unfair prejudice will be a vexing task for the district court. With the benefit of the detailed briefing on this appeal, undoubtedly the district court will consider carefully whether the article should be admitted and, if so, whether additional measures are required to minimize unfair prejudice, such as further redactions and cautionary jury instructions.

Fraga's sixth issue, the admissibility of evidence under Minn. Stat. § 634.20, warrants discussion, not only because the issue may arise in a new trial, but because this is an appropriate opportunity to clarify our view of the statute.

Section 634.20 provides:

> Evidence of domestic conduct by the accused against the victim of domestic conduct, or against other family or household members, is admissible unless the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Minn. Stat. § 634.20. While it is a statute, section 634.20 is a rule of evidence. We are not required to adopt a statute that regulates the admission of evidence. *See State v. McCoy*, 682 N.W.2d 153, 160 (Minn. 2004) (the constitution delegates rules of evidence exclusively to the courts) (quoting *In re Tracy*, 197 Minn. 35, 46, 266 N.W. 88, 93 (1936)). However, "we may appropriately exercise our supervisory power over Minnesota courts by adopting a reasonable statute regulating the admission of evidence even if it does directly conflict with a rule of evidence." *McCoy*, 682 N.W.2d at 160.

We adopted section 634.20 as a rule of evidence in *McCoy,* but only "for the admission of evidence of similar conduct[12] by the accused against the *alleged victim* of domestic abuse." *Id.* at 161 (emphasis added). Then, in *State v. Moore*, 846 N.W.2d 83, 91-92 (Minn. 2014), we impliedly extended *McCoy* to allow the admission of similar conduct by the accused against other family or household members. To remove any doubt, we make clear today that evidence of domestic conduct by the accused against family or household members other than the victim may be admitted pursuant to Minn. Stat. § 634.20, which, as a matter of comity, we adopt as a rule of evidence.

Clearly, Fraga's alleged sexual assault of his brother was evidence of "domestic conduct" by the accused against a "family member." *See* Minn. Stat. § 634.20 (defining "domestic conduct" in part as "evidence of domestic abuse"); Minn. Stat. § 518B.01, subd. 2(a) (2014) (defining "[d]omestic abuse" as "physical harm, bodily injury, or assault" against a family or household member); Minn. Stat. § 518B.01, subd. 2(b) (2014) (defining "[f]amily or household members" in part as "persons related by blood"). In a new trial, precisely how such evidence is offered, its probative value, the possibility of unfair prejudice, and the necessity of cautionary instructions to the jury will, of course, depend on the context.

---

[12]    Prior to 2013, section 634.20 used the phrase "similar conduct," not "domestic conduct." *See* Act of May 8, 2013, ch. 47, § 7, 2013 Minn. Laws 203, 208 (codified at Minn. Stat. § 634.20 (2014)). As the 2013 amendment did not change the underlying definition, this change of phrase is not material for the purpose of this case.

V.

We understand that the relatives of a little girl and others in the community of Worthington have suffered a grievous loss. We understand that they have endured the pain of two trials. We recognize that their grief may be sharpened by the decision today.

Still and all, it is a bedrock principle of our law that for a person to be convicted of any crime—major or minor—the jurors must be both impartial and unanimous. Our constitutions and the fairness they embody require that, if we cannot say that each and every juror was impartial, we cannot say that justice was done.

On this record, we cannot say that each and every juror was impartial. As this was structural error, we must reverse the judgments of conviction and remand for a new trial consistent with this opinion.

Reversed and remanded.