STATE OF MINNESOTA

IN SUPREME COURT

A22-1340

Wright County                                                    Anderson, J.
                                                     Took no part, Chutich, J.

State of Minnesota,

              Respondent,

vs.                                                       Filed:  February 21, 2024
                                                         Office of Appellate Courts

Gregory Paul Ulrich,

              Appellant.

_____

Keith Ellison, Attorney General, Jacob Campion, Assistant Attorney General, Saint Paul, Minnesota; and

Brian Lutes, Wright County Attorney, Buffalo, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Rachel F. Bond, Assistant Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The district court did not abuse its discretion in denying a motion by defendant to strike a juror for cause because the juror did not express actual bias requiring either rehabilitation or removal from the jury.

1

2.     The district court did not abuse its discretion in denying a motion by defendant to change venue based on the failure of defendant to renew the motion following voir dire.

3.     Guilty verdicts of first-degree premeditated murder and four counts of attempted first-degree premeditated murder are supported by the record.

Affirmed.

O P I N I O N

ANDERSON, Justice.

This appeal from a final judgment of conviction of first-degree murder presents three issues: (1) whether the district court abused its discretion in denying a motion to strike a juror for cause; (2) whether the district court abused its discretion in denying a motion to change venue; and (3) whether the record adequately supports the guilty verdicts.

A Wright County grand jury indicted appellant Gregory Paul Ulrich with first-degree premeditated murder, attempted first-degree premeditated murder, and discharge of an explosive or incendiary device.  Before the trial began, Ulrich moved to change venue, asserting that prejudicial media coverage had tainted the Wright County jury pool.  Ulrich also claimed prejudicial reporting prevented the trial from being held anywhere in the Twin Cities media market.  The district court denied that motion, but provided Ulrich with the opportunity to renew his motion following voir dire.  During jury selection, Ulrich moved to strike a juror for cause based on claims of prejudicial media reporting, but this motion was denied by the district court and Ulrich did not use a

2

peremptory challenge to remove the challenged juror. Following voir dire, Ulrich did not renew his motion to change venue. The jury found Ulrich guilty as charged.

Because we conclude that (1) the district court did not abuse its discretion in denying Ulrich's motion to strike a juror for cause; (2) Ulrich forfeited any right to contest the denial of his motion to change venue by failing to renew it; and (3) the record supports the guilty verdicts, we affirm.

**FACTS**

The following facts are undisputed. In 1977, Ulrich suffered a workplace injury that damaged his spine. Because of increasing chronic pain and the possibility that he would have to use a wheelchair for mobility, he decided to undergo surgery in 2016. Following the operation, Ulrich was prescribed opioid pain medication. Ulrich argued with his medical providers that he needed more pain medication than was prescribed. After sending documents to medical professionals and various public figures demanding more pain medication and receiving no responses, Ulrich directed his ire at the Allina Health clinic in Wright County, the clinic that had treated him. He blamed Allina for his continued pain, asserting that his "life was over" as a result of the care provided by the clinic, and had a sign found on his property claiming that the clinic and a doctor who had treated him were "evil."

In December 2020, Ulrich recorded a video with his cell phone in which he made threats against Allina and another medical company. He said, "I want you to know, what kind of person . . . was murdered by one sentence, one lie, and one oxycodone pill," and that it would "cost Allina[] . . . a lot. They're gonna find out what happens when you mess

3

with a Christian, a drug-free Christian. . . . That's somebody smart, with God's courage. . . . and then a military academy. Shouldn't have done that. You picked on the wrong person."

In another video, recorded later that month, Ulrich said that

pain causes people to be violent, hateful . . . . I hope that everybody that . . . is denied oxycodone the last couple years of life, when . . . you know you're gonna be stuck in a bed for the last few months, grab your f-ckin pistol and go down there and kill as many nurses as you can.

Prior to recording the videos, Ulrich bought a 9-millimeter handgun, along with supplies for constructing pipe bombs. On February 9, 2021, Ulrich traveled via a scheduled ride on a public transportation service in Buffalo to the Allina Health clinic. He brought with him his handgun, extra magazines of ammunition, four homemade pipe bombs, and three lighters. He ensured that the handgun was loaded prior to entering the clinic and also carried with him three full magazines of additional ammunition. At around 10:50 a.m., Ulrich entered the clinic.

Ulrich was greeted by staff at the clinic's reception desk. A receptionist, T.S., asked Ulrich to step toward the desk so that she could assist him. Ulrich then told her to get on the floor and not to move while aiming his gun at her. After T.S. got on the floor and entered a fetal position in response to Ulrich's demand, he went behind the reception desk and shot her twice, once in the hip and once in the lower back. Ulrich would later testify that he shot her at "pretty close" range. Ulrich then shot A.F., another employee also laying on the floor.

4

S.C., who was also an employee at the clinic, had heard a commotion near the front of the clinic and, upon investigation, encountered Ulrich, who was coming around a corner toward her. After S.C. looked at Ulrich, she only had time to ask him "Why?" before he shot her. She sustained a total of six gunshot wounds in the left chest, abdomen, back, upper left arm, and left forearm.[1] Ulrich then continued to search the clinic for further victims. He encountered J.G., another employee, who attempted to flee the building through a side door. He shot at her multiple times, striking her in the thigh; J.G. then hid for safety in a snowbank outside. Another employee tracked down by Ulrich was Lindsay Overbay, who was fleeing with J.G. Ulrich fatally shot Overbay.

After he shot these employees, several people who were at the clinic claimed to have heard an unfamiliar and seemingly steady voice calling for help; these witnesses testified that they believed this was an attempt by Ulrich to lure more victims out into the open. When no additional victims came forth, Ulrich proceeded to call 911. He told police that he was the shooter, and that they should send ambulances because there were victims with "critical spine injuries."[2] He also told the police to back away because he intended to detonate his pipe bombs. After shooting out the windows in the front of the clinic and detonating three pipe bombs, Ulrich surrendered to police.[3]

---

[1]     Medical records confirmed six gunshot wounds. Ulrich claimed at trial to have only shot her once despite the medical evidence to the contrary.

[2]     Police on the call initially asked Ulrich about the shooting after he said he was calling from the clinic, indicating that others had already called the police during the shooting before Ulrich.

[3]     The fourth pipe bomb that Ulrich brought to the clinic failed to detonate.

Once Ulrich was apprehended, he told officers that they would want to find his phone, which he had left in the clinic, because they would find evidence about the shooting on it. This was the same cell phone on which his videos threatening Allina were recorded.

A Wright County grand jury indicted Ulrich with first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2022), and four counts of attempted first-degree premeditated murder, Minn. Stat. § 609.17(1) (2022); *see also* Minn. Stat. § 609.185(a)(1). He was also indicted with one count of discharge of an explosive or incendiary device, Minn. Stat. § 609.668, subd. 6(c) (2022).

In April 2022, Ulrich filed a memorandum in support of a motion to change venue. Cited in that memorandum were media reports about his alleged confessions, publicity about the tragic events on the day of his attack on the clinic and its employees, as well as the relatively small population of Wright County. The memorandum also argued that widespread internet access in the community enabled easy access to news reports about the shooting. Ulrich claimed that these factors made Wright County specifically, and the Twin Cities media market more generally, unsuitable for the trial because the jury pool would be tainted by prejudice. The district court denied the motion, concluding that media coverage had subsided significantly in the intervening year and that, in any event, the horrific nature of the events and widespread reporting throughout Minnesota of those events made a change of venue likely ineffective. The district court also noted that much of the coverage simply reported undisputed facts, and the court also stated its intention to use an enlarged jury pool, which would ameliorate unfair prejudice, if any, resulting from the media

6

coverage.  Significantly, the court also permitted Ulrich to renew his motion following voir dire.

During voir dire by the district court, Juror 67 stated that he had read about the shooting and about Lindsay Overbay, who died as a result of the shooting.  In response to a question about whether he could set aside what he had heard in the media, he said, "I'm not saying it's going to be easy for me to do that, but I'm asked to do that in my job at some point."  When asked, "So do you think you can keep an open mind . . . throughout the trial," he responded, "I think so."  When the district court asked, "[D]o you think you can follow my instructions then?" he responded, "Yeah, I think so."  In addition, the court asked Juror 67 whether the proximity of the events to his family would make it difficult for him to serve as a juror.  He answered that "[he]'d like to say no.  No, like I said, I'll evaluate what I hear here as best I can."

During examination by Ulrich's counsel, when asked if he thought "that[] [was] going to continue to be difficult," Juror 67 responded, "Yeah, I think it will be [a] struggle for me."  He then added, however, that he would "have to really evaluate what I hear here."

Ulrich moved to strike Juror 67 for cause, and the district court denied the motion.  The district court stated that Juror 67 "struck me as a very conscientious juror. . . .  [H]e was very clear that he would work hard at it, and he appeared to be responding to the bias instruction that I had given . . . . I did not hear him indicate that he would not be able to do it."  The court also noted that Juror 67 was "very, very clear and very definitive in the manner in which he answered the questions about following the court's instructions, especially with regard to not considering anything from outside the courtroom."  The court

7

specifically asked defense counsel whether he wished to use a peremptory challenge and defense counsel declined. At the end of voir dire, the defense had used only 11 of its 15 peremptory challenges.

Ulrich testified at trial in his own defense, denying any intent to kill the victims of the shooting. The jury, including Juror 67, returned guilty verdicts on all counts. The Wright County District Court entered a final judgment of convictions, which included a conviction for first-degree premeditated murder, four convictions of attempted first-degree premeditated murder, and a conviction of discharge of an explosive or incendiary device. Ulrich appeals from the final judgement of convictions.

**ANALYSIS**

On appeal, Ulrich raises three issues: (1) whether the district court abused its discretion by denying his motion to strike Juror 67 for cause; (2) whether the district court abused its discretion by denying his motion to change venue; and (3) whether the record supports the jury's guilty verdicts. We address each issue in turn.

I.

Ulrich first argues that the district court abused its discretion by denying his motion to strike Juror 67 for cause. "We review the district court's denial of a challenge for cause for an abuse of discretion," and "[o]ur review of the district court's determination of juror impartiality is especially deferential." *State v. Munt*, 831 N.W.2d 569, 576 (Minn. 2013). The reason we give deference is that a district court is best positioned to judge a juror's demeanor, as opposed to an appellate court's review of a cold record. *State v. Prtine*, 784 N.W.2d 303, 310 (Minn. 2010). If, however, we conclude that the district court abused

8

its discretion in denying a motion to remove a juror for cause and the biased juror "actually sits in judgment of the defendant, any conviction must be reversed." *State v. Fraga*, 864 N.W.2d 615, 625 (Minn. 2015).

Our analysis of juror bias consists of two steps. *Id.* at 623. First, we must determine whether the juror expressed actual bias by reviewing the juror's voir dire answers in context. *Id.* If actual bias was expressed, then we must also assess whether the juror was properly rehabilitated, which requires that the juror "state[] unequivocally that [the juror] . . . will follow the district court's instructions and will set aside any preconceived notions and fairly evaluate the evidence." *Id.* (citation omitted) (internal quotation marks omitted).

The established standard in our jurisprudence for step one of this test is that a juror is not seated following a challenge if the juror "cannot try the case impartially and without prejudice to the substantial rights of the challenging party." *Munt*, 831 N.W.2d at 577 (citation omitted) (internal quotation marks omitted). In other words, a juror may be removed if the juror "expresse[s] a 'state of mind' demonstrating 'actual bias' towards the case or either party." *Id.* (quoting *State v. Brown*, 732 N.W.2d 625, 629 n.2 (Minn. 2007)) (further citation omitted). The burden is on the challenging party to prove actual bias. *Id.*; *see also* Minn. R. Crim. P. 26.02, subd. 5(1) (allowing a challenge for cause on the grounds that a "juror's state of mind . . . satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the challenging party").

The evidence of bias presented by Ulrich primarily relates to what he describes as equivocating language on the part of Juror 67. According to Ulrich, the district court

applied the incorrect legal standard because "the juror must state unequivocally that he or she will follow the district court's instruction and will set aside preconceived notions and fairly and impartially evaluate the evidence." Ulrich argues that the challenged juror must affirmatively disavow bias, even if actual bias is not otherwise established. In support of his argument Ulrich cites two decisions as authority for what he claims to be the appropriate standard: *State v. Munt*, 831 N.W.2d at 569, and *State v. Logan*, 535 N.W.2d 320 (Minn. 1995).

Ulrich's argument is unavailing because it misstates our standard for evaluating juror bias. As explained below, neither *Munt* nor *Logan* holds that a juror is required to disavow bias affirmatively in the first step of the juror bias analysis, and in step two of the analysis, the burden is on an appellant to prove actual bias requiring rehabilitation of the juror.

The language in *Munt* that Ulrich cites as favoring his view refers to an earlier decision from another jurisdiction that holds that actual bias is not expressed when the juror makes an unequivocal statement at the beginning of voir dire that the juror can render an impartial verdict. 831 N.W.2d at 578 (citing *People v. Willard*, 641 N.Y.S.2d 896, 900 (App. Div. 1996)). Ulrich cites no decision that requires such an affirmative statement from a juror as the *only* way to avoid an expression of actual bias. Adopting such a requirement would essentially compel jurors to disavow bias at the beginning of every voir dire or else risk a successful for-cause challenge. *Logan* mentions unequivocal assertions that a juror will follow instructions only in the case of a juror who requires *rehabilitation*

and thus requires application of *step two* of the juror bias analysis. 535 N.W.2d at 323. Even then, *Logan* merely states that this is how rehabilitation "typically" takes place. *Id.*

Ulrich also argues that Juror 67 expressed actual bias. In support of that argument, he mentions that Juror 67 had knowledge of the case from media coverage regarding Ulrich's anger toward his treatment by Allina, that Ulrich had shot people, and that Ulrich detonated explosives at the clinic. Juror 67 had also seen pictures of Lindsay Overbay, and he had knowledge of a community organization, Buffalo Strong, which formed in the aftermath of the shooting. Ulrich also mentions that Juror 67 responded in an "I think" form when questioned about whether he could set aside what he knew, and that he said, "I'd like to say no" when asked if he would have trouble being impartial due to the proximity of the events to his home. In addition, Juror 67 said he would "do the best [he] can" when directly asked by counsel for Ulrich if he could listen only to what he hears in the courtroom and stated that it may depend on the differences between what he heard in the courtroom and from the media.

Ulrich states that these are "equivocations and caveats" by Juror 67 and therefore constitute an expression of bias. He compares these responses to jurors in other cases who gave "I think" responses and who said they would "try" to be fair in other cases. In particular, Ulrich relies on *Fraga*, 864 N.W.2d at 625; *Prtine*, 784 N.W.2d at 309–11; and *Logan*, 535 N.W.2d at 324. Ultimately, these decisions do not support Ulrich's argument for relief based on actual juror bias.

First, unlike the juror at issue in *Fraga*, Juror 67 never expressed actual bias regarding Ulrich or the proceedings. In *Fraga*, the biased juror stated that he was

11

"uncomfortable" dealing with the case because of the subject matter and that he believed a "retrial" was necessary due to new evidence or a legal provision he could not identify. 864 N.W.2d at 624. The juror additionally told the court that his mother-in-law was a nurse at the hospital where the child victim was treated, and that she arrived for work later in the morning after the victim had died. *Id.* at 623. He also disclosed that he had discussed the case in detail with family and friends. *Id.* at 623–24. Referring to those discussions, he said that "[t]he fact you cannot talk about" the actions the defendant was accused of "speaks the magnitude of how they feel about it." *Id.* at 624. He also called the case "sickening" and said that he knew two witnesses on the witness list, as well as that he would be more likely to believe their testimony because of that familiarity. *Id.* It was when he was questioned about that predisposition that he said he "guess[ed]" he could form his own opinion. *Id.* The defense in *Fraga* had also argued that the juror in that case knew of a prior conviction of the defendant and that he had spoken extensively with his family about the case, including with one family member who had personal knowledge of it. *Id.* at 625. Additionally, and unlike here, when asked if there was a reason why he could not be fair and impartial, the juror in *Fraga* stated, "[b]esides the fact I know about the case, I don't, no." *Id.* We concluded, based on all of these facts, that the juror had expressed actual bias. *Id.* However, the juror here, unlike the one in *Fraga*, did not disclose any personal connection to the case, did not testify to any special knowledge he had regarding it, and did not indicate connection to anyone involved in the trial, such as witnesses or victims.

The juror in *Logan* stated that he would be predisposed to believing the testimony of police officers. 535 N.W.2d at 324. Similar circumstances were presented in *Prtine*,

12

which is also cited by Ulrich. 784 N.W.2d at 309–10. Nothing comparable occurred here. Ulrich points only to Juror 67's knowledge of the incident, media reports about the victim, and a community organization, and as to the latter, he specifically disclaimed any personal connection in any capacity. And even in the presence of some possible equivocation, the context of the voir dire makes clear that there was no expression of bias. Juror 67 said, for example, that he would "like to say no" when asked if the proximity of the events to his home would impact his ability to be fair. But he then immediately followed this by saying, "No, like I said, I'll evaluate what I hear here as best I can." He also said that he would follow the court's instructions unequivocally. His "I think" responses, which sometimes may indicate equivocation, echoed the questions, which were phrased as, "Do you think." In more open-ended questioning, when Juror 67 was asked if he would have difficulty setting aside what he had read, he said that "it's hard to say exactly," but "that's what has to happen." He also stated that he gets frustrated with the media, implying he was not predisposed to believing what he had read. When he was asked if he would follow the rule that he was required to disregard everything he had heard before the trial about events at the clinic, he directly responded, "Yes, I'll follow that rule."

The closest Juror 67 came to expressing any bias was in saying that "we all have a bias," but even here, he followed that statement by responding "yes" when asked once again whether he would disregard everything that he had heard about the shooting.

The United States Supreme Court has provided helpful guidance in dealing with jurors who have been exposed to media coverage about a case before trial by noting:

13

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. . . . To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961). The Supreme Court in *Irvin* recognized a "presumption" of impartiality; Ulrich provides no evidence overcoming that presumption. Moreover, we give deference to a district court's determination whether a juror is impartial. *Munt*, 831 N.W.2d at 576. And "[t]hat determination depends largely on the prospective juror's demeanor, and '[d]emeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying.' " *Id.* (second alteration in original) (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 n.14 (1984)). The district court found Juror 67 to be "very clear and very definitive," alluding to content of his speech that cannot be analyzed purely through a transcript. Because actual bias has not been proven by Ulrich, analysis of whether the juror was sufficiently rehabilitated is unnecessary.

For the foregoing reasons, we conclude that the district court did not abuse its discretion in denying Ulrich's motion to strike Juror 67 from the jury for cause.

## II.

The second issue raised by Ulrich is whether the district court abused its discretion in denying his motion to change venue. "The standard of review on a venue transfer challenge is whether the district court abused its discretion." *State v. Fairbanks*, 842 N.W.2d 297, 302 (Minn. 2014).

14

But dispositive here, and making further analysis unnecessary, is that Ulrich did not renew his motion to change venue after voir dire, despite being offered the opportunity to do so in the district court's order denying his motion to change venue. We have previously held that "[w]here a defendant is granted leave to renew his motion for change of venue immediately before trial, but declines to do so, he waives 'any right he may have had to a change of venue.' " *State v. Brom*, 463 N.W.2d 758, 762 (Minn. 1990) (quoting *State v. Knowlton*, 383 N.W.2d 665, 669 (Minn. 1986)).[4] When the initial motion was denied, the court stated in its order that the denial was "subject to a renewed motion after voir dire further elucidate[d] the issue." And in its initial denial, the court engaged in a thorough analysis of the factors which might create or dilute bias in the potential juror pool.

Ulrich argues that he should nonetheless be entitled to a review of the denial of his motion to change venue because the decisions discussing forfeiture in the context of venue involved jurors who were not challenged for cause. *See, e.g.*, *Brom*, 463 N.W.2d at 761. According to Ulrich, his for-cause challenge requires a different result here. We disagree.

We have not recognized, in our prior decisions, an exception such as Ulrich urges us to adopt, and we see no reason to do so here. Ulrich also does not explain why defense counsel did not use an available peremptory challenge to remove Juror 67 if, as Ulrich asserts, Juror 67 was actually biased or otherwise not suitable for service on this jury.

---

[4] While in *Brom* we used the word "waives," we have since clarified that waiver applies when a known right is voluntarily relinquished, whereas forfeiture is the failure to timely assert a right. *State v. King*, 990 N.W.2d 406, 420 n.7 (Minn. 2023).

The only juror Ulrich specifically challenges as even potentially affected by adverse publicity, and thus a reason to grant the motion to change venue, is Juror 67. Not only did Ulrich fail to renew his motion as required by our precedent, but his failure to use a peremptory challenge to remove the juror significantly compromises the basis for his argument to change venue in the first place.

For the foregoing reasons, we need not determine whether the district court abused its discretion in denying Ulrich's motion for a change of venue because Ulrich forfeited appellate review of the issue when he failed renew his change of venue motion following voir dire.

## III.

Finally, Ulrich claims that there is insufficient evidence in the record to support his convictions of first-degree premeditated murder and attempted first-degree premeditated murder because the circumstances proved support a reasonable inference that he intended merely to injure the victims rather than kill them. We disagree.

Premeditation and intent to kill are generally proven through circumstantial evidence. *State v. Gilleylen*, 993 N.W.2d 266, 275 (Minn. 2023); *State v. Colgrove*, 996 N.W.2d 145, 150, 152–53 (Minn. 2023). Minnesota Statutes § 609.18 (2022) defines "premeditation" as "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." We have previously held that "[t]hree categories are relevant in determining premeditation: planning activity, motive, and the nature of the killing." *State v. Anderson*, 789 N.W.2d 227, 242 (Minn. 2010). Minnesota Statutes § 609.02, subd. 9(4) (2022), defines "[w]ith intent to" as "that the actor either has a purpose

16

to do the thing or cause the result specified *or believes that the act, if successful, will cause that result*." (Emphasis added.)

When the State presents only circumstantial evidence to prove the elements of premeditation or intent to kill, we apply a two-step analysis in assessing the sufficiency of the evidence on those elements. *Colgrove*, 996 N.W.2d at 150. First, we identify the circumstances proved by "winnow[ing] 'down the evidence presented at trial' to a 'subset of facts' that is consistent with the jury's verdict and 'disregard evidence that is inconsistent with the jury's verdict.'" *Gilleylen*, 993 N.W.2d at 275 (quoting *State v. Harris*, 895 N.W.2d 592, 600–01 (Minn. 2017)). Second, we consider whether the reasonable inferences that can be drawn from the circumstances proved, when they are viewed as a whole and not as discrete isolated facts, are consistent with the hypothesis that the accused is guilty and inconsistent with a hypothesis the accused is not guilty. *State v. Hassan*, 977 N.W.2d 633, 640 (Minn. 2022).

Here, the relevant subset of facts (i.e., the circumstances proved) are as follows. Ulrich bought a 9-millimeter handgun, along with supplies for constructing pipe bombs. He then recorded videos with his cell phone in which he made threats, which included the statements, "I want you to know, what kind of person . . . was murdered by one sentence, one lie, and one oxycodone pill[,]" and "I hope that everybody . . . denied oxycodone . . . grab your f-ckin pistol and go down there and kill as many nurses as you can." Less than 2 months after suggesting that persons denied oxycodone should kill as many nurses as they can, Ulrich traveled to the Allina Health clinic in Buffalo armed with the 9-milimeter handgun, ammunition, and four pipe bombs.

17

Ulrich entered the clinic, where he was greeted by staff at the clinic's reception desk. As Ulrich stepped toward the reception desk, he pulled out the handgun and ordered the receptionist, T.S., to get on the floor and not move. After T.S. fully complied with his demand, Ulrich shot her twice, once in the hip and once in the lower back. Ulrich also shot A.F., a second employee who was also laying on the floor, at "pretty close" range.

After shooting these two employees, Ulrich searched the clinic for more targets. When he encountered clinic employees Lindsay Overbay and J.G. as they tried to flee the building through a side door, Ulrich fired multiple shots, fatally shooting Overbay in the spine and shooting J.G. in the thigh; J.G. managed to escape through the side door and hide behind a snowbank.

When S.C. headed to the front of the clinic to investigate the situation, she encountered Ulrich. She only had time to ask him "Why?" before Ulrich shot her a total of six times, wounding her in the left chest, abdomen, back, upper left arm, and left forearm.[5]

After Ulrich shot S.C., several people who were still inside the clinic heard an unfamiliar and seemingly steady voice calling for help; they did not respond to the calls for help because they believed they were an attempt by Ulrich to lure more targets into the open. When no additional targets came forth, Ulrich called 911. He told police that he was the shooter, and that they should send ambulances because there were victims with

---

[5]     Although Ulrich testified that he only shot S.C. once despite medical evidence to the contrary, we cannot include that testimony in the subset of relevant facts because, in identifying the circumstances proved, we must assume the jury resolved this factual dispute in the State's favor.

"critical spine injuries." But before allowing any aid to reach the victims, Ulrich detonated three of the pipe bombs; the fourth pipe bomb that Ulrich brought to the clinic failed to detonate. Ulrich later admitted that he "kn[e]w the risk" of shooting people—that they could very well die.

When viewed as a whole, we conclude that the circumstances proved by the State support a reasonable inference that Ulrich planned to shoot the victims and that he believed that if his plan was successful, it would cause the death of the victims. Here, Ulrich had recorded a video less than 2 months prior to the shooting making a call to violence against nurses. He shot T.S. and A.F. at close range, in the back, as they were lying defenseless on the floor. He shot Overbay in the back as she was attempting to get away. And he fired multiple shots at J.G. and S.C. Moreover, Ulrich failed to seek timely medical aid for the victims who did not die instantly; instead, he chose to falsely call out for help attempting to draw more targets into the open. After he was apprehended by police, Ulrich indicated to police that they should collect the same cell phone on which he had made his recorded threats. Under our case law, these acts plainly establish premeditation and an intent to kill.

On the issue of premeditation, we have held that "shooting a prone victim" leads to an inference of premeditation, *State v. Palmer*, 803 N.W.2d 727, 739 (Minn. 2011), "evidence showing that the defendant inflicted wounds to the victim's vital organs may support an inference of premeditation," *State v. Cox*, 884 N.W.2d 400, 413 (Minn. 2016), "[a] single shot squarely in the back can support a finding of premeditation because it indicates that the shooter took careful aim at the victim," *State v. Kendell*, 723 N.W.2d 597, 607 (Minn. 2006), "[m]ultiple gunshots are indicative of premeditation," *State v. Cooper*,

19

561 N.W.2d 175, 180 (Minn. 1997), and "[t]he failure to administer any aid to a victim who does not die instantaneously also supports an inference of premeditation," *Cox*, 884 N.W.2d at 414. On the issue of intent, we have previously held that "pointing a loaded gun at a person and firing it is likely to cause death and leads to an inference of intent." *Stiles v. State*, 664 N.W.2d 315, 320 (Minn. 2003).

Having concluded that the circumstances proved, as a whole, support a reasonable inference that Ulrich planned to shoot the victims and that he believed that if his plan was successful, it would cause the death of the victims, we must next consider whether the circumstances proved, as a whole, support a reasonable inference that Ulrich is not guilty.

Ulrich argues that the circumstances proved support a rational inference that he intended merely to injure the victims rather than kill them. We disagree. Ulrich's argument focuses on discrete isolated facts, rather than the circumstances proved as a whole. *See State v. Colgrove*, 996 NW.2d at 150. For example, he focuses on the circumstance proved that he only shot some of the victims once. But that disregards the fact that he shot several of the victims multiple times and at close range. And before the shooting, he encouraged people to kill, not injure, as many nurses as they could. He also points to the circumstance proved that he attempted to render aid because he called 911 and stated assistance was required because there were critical injuries. But following those calls, he set off three pipe bombs before the ambulances arrived, and the call to 911 was only after he had attempted to lure more victims into a trap by pretending that he needed help. Based on the circumstances proved as a whole, it is unreasonable to conclude that Ulrich did not premeditate the murders and intend to kill the victims.

20

In sum, when viewed as a whole, we conclude that the circumstances proved support a reasonable inference that Ulrich acted with premeditation and an intent to kill and are inconsistent with a reasonable inference that he simply intended to injure the victims. Consequently, the guilty verdicts of first-degree premeditated murder and four counts of attempted first-degree premeditated murder are supported by the record.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of convictions entered by the district court.

Affirmed.

CHUTICH, J., took no part in the decision of this case.